## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN PETERNEL,

               Plaintiff,

               v.

SEAN P. DUFFY,
in his official capacity as Secretary of the
U.S. Department of Transportation,

               Defendant.

Civil Action No. 23-670 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Plaintiff John Peternel is an economist at the GS-13 grade level in the Department of Transportation's Federal Railroad Administration ("FRA"). Believing he was denied a promotion, a transfer, and a cash bonus for retaliatory reasons, plaintiff initiated this suit against defendant Sean P. Duffy, Secretary of the Department of Transportation, in his official capacity, alleging one count of retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), *see* 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act of 1967 ("ADEA"), *see* 29 U.S.C. § 621 *et seq.* *See generally* Am. Compl., ECF No. 9.[1] Following resolution of defendant's prior motion for partial dismissal of certain parts of plaintiff's claim, *Peternel v. Buttigieg*, No. 23-cv-670 (BAH), 2023 WL 8233548 (D.D.C. Nov. 28, 2023), and completion of approximately 10 months of discovery, defendant has now moved for summary judgment on plaintiff's retaliation claim, explaining that plaintiff's work performance failed to meet the standard required for a promotion and a cash bonus, and that no transfer opportunities existed. For the reasons discussed below, defendant's motion is granted.

---

[1]     Sean P. Duffy, the current Secretary of the U.S. Department of Transportation, is substituted for his predecessor as the defendant. *See* Fed. R. Civ. P. 25(d).

## I.  BACKGROUND

Plaintiff, 51 years old when he commenced this lawsuit, joined the FRA in November 2015 as a GS-12 Industry Economist in the Office of Research, Data, and Innovation ("RDI Office").  Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts & Supporting Undisputed Material Facts ("Pl.'s SUMF") ¶¶ 1, 2, 10, ECF No. 33-1.  In November 2016, plaintiff was promoted to the GS-13 grade level.  *Id.* ¶ 5.  Since November 2017, plaintiff has been eligible for the GS-14 grade level but has obtained no higher promotions.  *Id.* at 75.  Plaintiff contends that only retaliation from his first-line supervisor, Marc Fuller, can explain the lack of promotion, as well as the denials of his transfer requests and a bonus award in the form of cash instead of the time-off he was awarded.  The factual background for this contention is summarized below, followed by the procedural history of this action.

### A.  Factual Background

#### 1.  *Plaintiff's Interactions with Supervisor Fuller Before Engaging in Protected Activity*

In June 2017, Fuller, about eight years younger than plaintiff, joined the FRA as a Staff Director and became plaintiff's direct supervisor.  Pl.'s SUMF ¶¶ 6-7, 11.  At the time, plaintiff had completed approximately seven months of work at the GS-13 level.  *Id.* ¶ 5 (plaintiff promoted to GS-13 in November 2016).  In July 2017, about a month after Fuller joined, Fuller received a request from plaintiff for a GS-14 promotion later that year, in November 2017.  *Id.* ¶ 21.  Fuller denied the request, explaining that he needed more time to review plaintiff's work.  *See* Pl. Deposition Transcript ("Dep. Tr.") 59:6-10 (Oct. 21, 2024), Def.'s Ex. 3 at 27, ECF No. 28-6.  The same month that Fuller denied plaintiff's promotion request, Fuller promoted plaintiff's co-worker Mark Anderson, who plaintiff asserts had completed 11 months of work at a lower grade level before Fuller joined as a supervisor and, like plaintiff, had worked

only one month under Fuller's supervision.  Pl.'s SUMF ¶ 125; *see also* Def.'s Reply Supp. Statement of Undisputed Material Facts ("Def.'s SUMF Reply") ¶ 125, ECF No. 38-1.

Fuller had several requirements for a GS-14 promotion.  In Fuller's view, a GS-14 economist should have worked as a primary economist on a "good-sized" rulemaking project. Fuller Dep. Tr. 24:2-10, 180:6-12, Def.'s Ex. 5 at 6, 45, ECF No. 28-8.  A primary economist leads the economic analyses required for the rulemaking, updates the Economics Weekly Update, and sets up meetings with subject matter experts and attorneys early in the rulemaking process to allow alternatives to be considered.  Pl.'s SUMF ¶ 18.  Fuller also believed a GS-14 economist should be able to work independently, produce written products that require minimal edits, work cooperatively with Fuller, and effectively lead a team.  *Id.* ¶ 25.  Finally, Fuller believed that to be promoted to a GS-14, a GS-13 economist should obtain an "Exceeds Expectations" or an "Outstanding" performance rating.  *Id.* ¶ 29.

Around October 2017, Fuller assigned plaintiff as the primary economist to work on the State Action Plan rule as an opportunity for plaintiff to demonstrate GS-14 level work.  *Id.* ¶¶ 31-33.  Over a year into the project, however, Fuller told plaintiff that his work required more oversight than expected for a GS-14 economist.  *Id.* ¶ 39.  According to Fuller, plaintiff failed to work with subject matter experts on the economic analysis early in the rulemaking process to develop the methodology, instead waiting until the last second.  *Id.* ¶ 38.  Fuller also critiqued plaintiff for taking too long to finish the economic analysis, *id.* ¶ 40, which Fuller found was poorly written and failed to incorporate his edits, *id.* ¶¶ 34-36.  Fuller further noted, and plaintiff concedes, that plaintiff continued changing the numbers in the economic analysis after Fuller had already begun his review.  *Id.* ¶ 37.  Fuller did not promote plaintiff following his work on the State Action Plan.

Around 2018, Fuller assigned plaintiff to rewrite the regulatory analysis in the Locomotive Engineering Certification Rulemaking ("Locomotive Rule"). Pl.'s SUMF ¶¶ 41-43. Fuller attests that when he received plaintiff's work on the Locomotive Rule, he observed many problems, including that the analyses were "not clearly written," "not actually completed," and contained methodological issues that "should have been taken care of weeks prior to submission" to Fuller for review. Marc Fuller Affidavit ("Fuller Aff.") (Mar. 3, 2021), Def.'s Ex. 4 at 21, ECF No. 28-7. Finding that plaintiff was "unable to demonstrate GS-14 level performance," Fuller also did not promote plaintiff following his work on the Locomotive Rule. *Id.*

At plaintiff's December 2018 mid-year performance review, Fuller explained that plaintiff would need to "take a rule from beginning to end" to be promoted. Pl.'s SUMF ¶ 23. Specifically, Fuller informed plaintiff that he would need to complete an economic analysis of sufficient quality to accompany both the notice of proposed rulemaking and final rulemaking for a rule. *Id.* ¶¶ 15, 24. Plaintiff, however, believing Fuller had no intention of assigning him any promotion-eligible rulemaking in the foreseeable future, complained to his second-line supervisor, Karl Alexy. John Peternel Affidavit ("Peternel Aff.") (Jun. 16, 2025), Pl.'s Ex. 19 at 4, ECF No. 33-23. Around this time, Fuller assigned plaintiff the Mechanical Employee Drug and Alcohol Rule (the "Drug and Alcohol Rule") as an opportunity for plaintiff to demonstrate GS-14 level work. Pl.'s SUMF ¶ 48.

Separately, shortly after joining the RDI Office in 2017, Fuller required all economists under his supervision to review their respective rulemaking projects and fill out the Economics Weekly Update, a file detailing all the active rulemaking projects in the RDI Office. *Id.* ¶¶ 132-34. Fuller explained that he used the Economics Weekly Update to brief the Legal

Department and higher-level officials within the FRA, the Secretary of Transportation's Office, and the White House's Office of Management and Budget. *Id.* ¶ 139.

Fuller made clear that the Economics Weekly Update must be reviewed each week to ensure accuracy since he relied on these numbers when reporting to higher-level management. *Id.* ¶ 136. For instance, Karen McClure, a co-worker of plaintiff's, attested that when she was hired in June 2019 by Fuller, she "was made aware that [e]conomists would not receive credit for the Economics Weekly Update for a particular week if it included one numeric error." Karen McClure Affidavit ("McClure Aff."), Def.'s Ex. 12 at 3, ECF No. 28-15; *see also* Ullah Kifayat Affidavit, Def.'s Ex. 10 at 3, ECF No. 28-13 (stating it was "true" that an economist "would receive a zero for the entire [Weekly Update] assignment" if he "makes one number error," and attesting that he himself "had one missing [number] on [his] Weekly Update report and received [a] zero for the entire report"). McClure further explained that "Fuller remind[ed] his entire staff during weekly staff meetings that [they] must check each number in [their] economics reports," and "has told [them] that he reports these numbers to his superiors during weekly office meetings and they must [] be correct as they influence policy decisions." McClure Aff., Def.'s Ex. 12 at 3-4, ECF No. 28-15. To track progress, Fuller required his staff to email him each week confirming that they had reviewed and updated their portion of the Economics Weekly Update. *See id.* Successful completion of the task yielded a "Yes" rating for that week, while failures resulted in a "No" rating. *See* Pl.'s SUMF ¶ 165.

Completion of the Economics Weekly Update reports factored into the economists' performance plans as one of two performance targets under Performance Element 1. *Id.* ¶ 141. To obtain an "Achieved Results" rating for Performance Element 1, an economist must

"complete" the weekly updates 70% of the time.  *Id.* at ¶ 142.  To obtain an "Exceeds Expectations" rating, an economist must complete the updates 80% of the time.  *Id.* at ¶ 143.

For the 2018-2019 performance year, which ran from June 1, 2018 to May 31, 2019, Fuller originally rated plaintiff as "Achieved Results" for Performance Element 1, finding that plaintiff only completed his weekly updates 73% of the time, *see* Pl.'s 2018-2019 Performance Evaluation, Def.'s Ex. 15 at 20, ECF No. 28-18.  Plaintiff disputed the rating, arguing he did not know the updates needed to be completed "perfectly," believing it only needed to be completed. Pl.'s SUMF ¶ 146.  From plaintiff's perspective, the "Economics Weekly Update was an assignment that Mr. Fuller did not expect economists to spend much time on, as the assignment was an internal assignment."  *Id.*

More broadly, in Fuller's summary of plaintiff's 2018-2019 performance evaluation, Fuller commended plaintiff for "[v]olunteer[ing] for special projects," "[w]ork[ing] on multiple projects at the same time," and doing an "[e]xcellent job on the Hot Topics."  Pl.'s 2018-2019 Performance Evaluation, Def.'s Ex. 15 at 25, ECF No. 28-18.  Nevertheless, Fuller suggested areas for improvement, noting plaintiff could work on "[d]evelop[ing] a plan and methodology with the assistance of the [subject matter experts] early in [his] analysis," "[m]eet[ing] deadlines," "[c]arefully review[ing] comments" and not "[m]iss[ing] comments," and "[m]ak[ing] sure [the] Weekly update is accurate, especially all numbers and dates."  *Id.*

### 2.  *Plaintiff Engages in Protected Activity on July 15, 2019*

In a meeting with Alexy on July 15, 2019, plaintiff accused Fuller of intentionally denying plaintiff opportunities for promotion because plaintiff was "old."  *Id.* ¶¶ 67-68.  Alexy responded that plaintiff was not old, to which plaintiff countered that he was "almost 50."  *Id.* ¶ 68.  The parties agree that plaintiff first engaged in activity protected by the ADEA at this July

15, 2019 meeting with Alexy when plaintiff raised concerns of age discrimination.  *See Peternel,*

2023 WL 8233548, at *6.

### 3.  *Plaintiff's Interactions with Supervisor Fuller After Engaging in Protected Activity*

#### a.  Fuller Retroactively Increases Plaintiff's 2018-2019 Performance Rating, Assigns Him the Brakes III Rule as a Path to Promotion, and Awards Him an Eight-Hour Time-Off Bonus but No Cash Bonus

On July 16, 2019, following plaintiff's meetings with Alexy and Fuller to dispute his

performance rating, Fuller emailed plaintiff to clarify his expectations about the Economics

Weekly Update.  Fuller explained to plaintiff:

> I understand the frustration that you expressed to me and [Alexy] yesterday during our meeting.  I stand by the criteria in the Performance Plan.  If the Updates are not reviewed and updated on a weekly basis, it does not serve the purpose it was meant to [serve].  I understand that errors occur, but with the intent to review these updates weekly, error[s] should be found and fixed by the following week.

Email from Fuller to Peternel (Jul. 16, 2019), Def.'s Ex. 18 at 8, ECF No. 28-21.  With this

clarification and accepting plaintiff's professed confusion over the expectations, Fuller upgraded

plaintiff's "Achieved Results" rating to "Exceeds Expectations" for Performance Element 1 for

the 2018-2019 performance year and notified plaintiff that the no-error standard applied going

forward.  *Id.* ("As you now have a clear understanding I will hold you, as I do the entire division,

to this standard in the 2019-2020 year.").  Fuller then went on express his concerns with the

quality of plaintiff's other work and the high level of oversight his work required:

> John, I truly would like to see you promoted to a GS-14.  As we have discussed multiple times throughout the year, the work product you have produced is not satisfactory.  All economic analyses you have provided required significant edits, revisions and comments from me.  This pattern has caused me to take extra time to carefully review all economic analyses you have provided.  To your credit, after I have reviewed and given you a list of edits, you have made the corrections and the analyses ha[ve] been made acceptable.  A GS-14's draft should require very few edits.  The documents should be economically accurate, legally correlated to the [Notice of Proposed Rulemaking] or Final Rule, have minimal errors, read well, and be well organized.  I am not worried about editorial or

> stylistic changes. However, it is important to me that each paragraph reads well and makes sense.

*Id.* Fuller then proceeded to outline the steps for plaintiff to obtain a GS-14 promotion. First, Fuller alerted plaintiff that the Drug and Alcohol Rule assigned in December 2018 would not qualify to demonstrate plaintiff's ability to complete GS-14 level work since Fuller "didn't realize how small that rule [was]," as the rule did not require plaintiff to do anything other than follow past templates for previous Drug and Alcohol rules, and thus "should not take [plaintiff] very much time." *Id.* Second, to provide plaintiff an opportunity to demonstrate GS-14 level work, Fuller removed plaintiff's co-worker Mark Anderson as the primary economist on the "Brakes III Rule" and assigned plaintiff as the primary economist instead. Fuller explained:

> I would like to be very specific in your path forward . . . . I would . . . like to make you the primary economist of Brakes III. This rule is the highest priority of the Administrator and we can expect he will want it completed on an expedited timeline. By being the lead economist on this rule, it will allow you to work closely with the members of the rail industry, FRA's subject matter experts, and FRA's chief counsel. You will be asked to brief senior leadership on the progress of the rulemaking.

*Id.* at 8, 15. Finally, Fuller indicated that successful completion of these rulemaking projects would support a GS-14 promotion. *Id.* at 9; *see also* Pl.'s SUMF ¶¶ 69, 70, 75.

Separately on July 16, 2019, Fuller recommended that plaintiff receive an eight-hour time-off award for his 2018-2019 performance, rather than the cash award that plaintiff requested. Pl.'s SUMF ¶¶ 174, 176, 178. Other co-workers who had received "Exceeds Expectations" or "Outstanding" ratings received cash awards, and some also received additional time-off awards. *See* Bonus Spreadsheet, Pl.'s Ex. 4 at 10, ECF No. 33-6 (showing that five employees received $500 to $550, three employees received $1,000, one employee received $2000, and one employee marked as "N/A"). Fuller explained that plaintiff received a time-off award rather than a cash bonus because plaintiff had continually missed deadlines and struggled with the work assigned. Pl.'s SUMF ¶ 176.

8

b. Fuller Retroactively Grades Plaintiff a "No" for Five Economics Weekly
    Update Reports Containing Numerical Errors

On July 19, 2019, three days after Fuller's email to plaintiff reiterating the no-error

standard for the Economics Weekly Update reports, plaintiff submitted a weekly update

containing numerical errors. *Id.* ¶¶ 166-167. Specifically, plaintiff transposed two numbers

from the annualized value of a rulemaking. *Id.* For the next four weeks, plaintiff submitted

weekly updates with the same numerical errors, with the last erroneous update submitted on

August 16, 2019. *Id.* ¶ 166.

The errors came to light because, on August 16, 2019, then-Acting Staff Director

Prabhdeep Chawla relied on plaintiff's numbers to answer a question from the FRA's Office of

Chief Counsel. *Id.* ¶¶ 156-57. Due to the incorrect numbers in plaintiff's update, Chawla

provided an inaccurate answer, which Chawla deemed "an embarrassment for [the] team."

Prabhdeep Chawla Affidavit, Def.'s Ex. 9 at 5, ECF No. 28-12. Chawla reported the error to

Fuller, who then reviewed plaintiff's weekly reports and saw that the same error had appeared

for five consecutive weeks. Pl.'s SUMF ¶ 161.

Fuller concluded that plaintiff had not checked the accuracy of the numbers reported for

those five weeks and, every week between July 19, 2019 and August 16, 2019, erroneously

represented to Fuller that he reviewed the updates. *Id.* ¶ 162. Fuller thus instructed that

plaintiff's credit for the Economics Weekly Update reports be retroactively assigned a "No" for

those five weeks. *Id.* ¶ 165.

c. Fuller is Dissatisfied with Plaintiff's Performance on the Drug and
    Alcohol Rule and Plaintiff's Filing of EEO Complaints

Fuller assigned plaintiff to work on the Drug and Alcohol Rule in December 2018. *Id.*

¶ 48. On August 1, 2019, Fuller emailed plaintiff requesting a timetable for the economic

analysis, given that "[plaintiff] said [he] would provide [Fuller] with a time table" by July 31,

2019.  Email from Fuller to Peternel (Aug. 2, 2019), Def.'s Ex. 18 at 12, 14, ECF No. 28-21.

Plaintiff emailed back indicating he "held off" on updating Fuller because he "wanted to speak

with [Fuller] in person prior to putting down a specific date."  *Id.*  On August 2, 2019, Fuller

advised plaintiff, "As we have discussed before, if you are not going to meet a deadline let me

know prior to the deadline date.  I understand the desire to talk to me in person, but sending an

email to communicate this message would have been sufficient."  *Id.* at 11, 13.  In plaintiff's

affidavit, plaintiff attests that he shared a timetable with his soon-to-be supervisor, Anderson,

rather than with his then-supervisor, Fuller.  Peternel Aff., Pl.'s Ex. 19 at 7, ECF No. 33-23.

On August 4, 2019, plaintiff initiated an informal Equal Employment Opportunity

("EEO") complaint, formally alleging age-based discrimination by Fuller.  Pl.'s SUMF ¶ 246.

This was followed, on November 21, 2019, by plaintiff filing a formal EEO complaint alleging

both age and sex discrimination because plaintiff believed "Fuller made a large issue" about

plaintiff's delay in submitting the timetable and "verbally berated [him] for several minutes."  *Id.*

¶ 247; Peternel Aff., Pl.'s Ex. 19 at 7, ECF No. 33-23.  The parties agree that plaintiff first

engaged in activity protected by Title VII when he filed this formal EEO complaint.  *See*

*Peternel*, 2023 WL 8233548, at *6.

Later, plaintiff told Fuller he would complete the economic analysis for the Drug and

Alcohol Rule by December 16, 2019, but then, on that date, plaintiff told Fuller he would need

until December 18.  Pl.'s SUMF ¶¶ 57-58.  "[P]rovid[ing] an extra 24 hours as a buffer," Fuller

set Thursday, December 19 as plaintiff's deadline.  Email from Fuller to Patterson (Jul. 7, 2020),

Def.'s Ex 18 at 29-30, ECF No. 28-21; *see also* Pl.'s SUMF ¶ 59.  On December 19, plaintiff

told Fuller that he would need to work more over the weekend to complete the analysis.  Pl.'s

SUMF ¶ 60.  Due to plaintiff's approved leave, and not wanting plaintiff to work over the weekend, Fuller extended the deadline to January 3, 2020.  *Id.* ¶ 61.

Fuller also found that, in addition to needing multiple extensions, plaintiff required significant edits, revisions, and comments to his work.  Email from Fuller to Peternel (Jul. 16, 2019), Def.'s Ex. 18 at 8, ECF No. 28-21.  Fuller further reprimanded plaintiff for failing to discuss his methodology early in the process, waiting instead until after "essentially everything was done" and leaving little room to confer with the Office of the Secretary of Transportation before the methodology was finalized.  Fuller Dep. Tr. 82:20-83:1, 84:12-85:2, Ex. 5 at 20-21, ECF No. 28-8.  Plaintiff disagrees with Fuller's assessment of his performance, insisting that he "created an innovative way to estimate benefits and produced an outstanding economic analysis which almost certainly would result in the [FRA] promoting Plaintiff" absent retaliation from Fuller.  Pl.'s SUMF ¶ 64.

On February 3, 2020, plaintiff filed his second informal EEO complaint, and then followed up with a formal complaint on May 18, 2020.  *See* Pl.'s SUMF ¶¶ 248-49.

### d.  Fuller is Dissatisfied with Plaintiff's Performance on the Brakes III Rule

In Fuller's view, similar issues involving unmet deadlines, poor communication, and unsatisfactory work permeated plaintiff's work on the Brakes III Rule.  When Fuller assigned plaintiff the Brakes III Rule in July 2019 as a path to promotion, Fuller communicated to plaintiff that the Brakes III Rule was "the highest priority of the Administrator," who wanted it "completed on an expedited timeline."  Email from Fuller to Peternel (Jul. 16, 2019), Def.'s Ex. 18 at 8, ECF No. 28-21.

Plaintiff's deadline to complete the draft economic analysis for the Brakes III Rule was October 15, 2019.  Pl.'s SUMF ¶ 80.  On October 17, two days after the deadline, plaintiff told Fuller that only 20% of the Brakes III Rule had been drafted.  *Id.* ¶ 81.  Plaintiff did not notify

Fuller of his completion of the work until November 12, almost a month after the original deadline. *Id.* ¶ 82. Upon review, Fuller found the regulatory economic analysis was not well written, Fuller Dep. Tr. 190:13-191:1, Ex. 5 at 32, ECF No. 28-8, but when Fuller began editing the analysis, he saw that plaintiff was still working in the document, Pl.'s SUMF ¶ 83. Plaintiff continued to make edits on November 13 and November 14, *id.* ¶ 83, requiring Fuller to stop his review "because [p]laintiff had made changes to major sections of the analysis," *id.* ¶ 84. After Fuller resumed review and provided his comments, plaintiff assured Fuller he would respond to the comments by December 5, 2019. *Id.* ¶ 85. On December 5, plaintiff told Fuller he needed until December 6. *Id.* ¶ 86. On December 6, plaintiff told Fuller he needed still more time, and Fuller granted another extension to December 9. *Id.* ¶¶ 87, 88.

Fuller also found that plaintiff was unable to work well with his team, which plaintiff disputes. Fuller Dep. Tr. 190:13-191:1, Def.'s Ex. 5 at 32, ECF No. 28-8. According to Fuller, plaintiff ignored the advice given by Chawla and Anderson, both senior GS-14 economists, about what questions to ask external stakeholders at a meeting. *Id.* at 194:13-195:9. In another instance, plaintiff edited his co-worker Chip Bishop's work without first consulting him, upsetting Bishop and resulting in a confrontation. Pl.'s SUMF ¶¶ 100, 103. Fuller attests that during this confrontation, he found plaintiff to be "unprofessional," "condescending," and "very cynical" towards Bishop, and warned plaintiff to "quit patronizing his co-worker." Fuller Dep. Tr. 89:16-90:19, 92:16-19, Ex. 5 at 22, ECF No. 28-8; Fuller Aff. (Mar. 3, 2021), Def.'s Ex. 4 at 22, ECF No. 28-7. Plaintiff, on the other hand, denies this and attests that "Fuller listened to both side[s] and agreed that [p]laintiff was correct in fixing Mr. Bishop's methodological error." Peternel Aff., Pl.'s Ex. 19 at 9, ECF No. 33-23.

Finally, Fuller found plaintiff unprepared for a meeting with external stakeholders on July 25, 2019.  During that meeting, an external stakeholder asked plaintiff about a specific spreadsheet.  Pl.'s SUMF ¶ 93.  Plaintiff denied ever receiving it.  *Id.*  However, Fuller learned from Chawla and Anderson that plaintiff had been sent the spreadsheet a week before the meeting.  *Id.* ¶¶ 95-97.  Accordingly, Fuller concluded that plaintiff was either not fully prepared for the meeting or had provided the external stakeholder false information.  *Id.* ¶ 98.

### e.  Fuller Assigns Paperwork Reduction Act Duties to Plaintiff and Two Others

Paperwork Reduction Act duties entail reviewing every three years all the paperwork burden that is placed on the stakeholders and the rail industry for every rulemaking.  *Id.* ¶¶ 182-83.  Bob Brogan, an analyst in the RDI Office, had originally performed the job but retired in September 2019.  *Id.* at ¶ 181.  When Brogan retired, he told Fuller it would take as many as three people to replace him.  Fuller Aff. (Oct. 26, 2020), Def.'s Ex. 4 at 15, ECF No. 28-7.  Hodan Wells, an economist in the RDI Office, volunteered to take over Brogan's work, and because Fuller believed Brogan was "exaggerating" about needing at least three people for the job, Fuller did not initially assign anyone else besides Wells to these duties.  *Id.*

Around March 2020, however, Fuller became aware that Wells had become overwhelmed with the Paperwork Reduction Act work.  Pl.'s SUMF ¶ 185.  In response, Fuller first asked plaintiff's co-worker John Purnell to assist Wells.  *Id.* ¶ 186.  A month later, when Fuller realized more back up was needed, Fuller assigned plaintiff to assist Wells and Purnell.  *Id.* ¶ 187.  Both Purnell and plaintiff were assigned to work on Paperwork Reduction Act duties one day a week.  *Id.* ¶ 188.  To account for this change, Fuller added Paperwork Reduction Act duties to both Purnell's and plaintiff's 2019-2020 performance plan to enable both to receive

credit for performing the work. *Id.* ¶ 189. Plaintiff, however, notes that Fuller did not designate plaintiff's Paperwork Reduction Act duties as an additional path to his promotion. *Id.*

    f.   <u>Fuller Issues Plaintiff a Final Overall Rating of "Achieved Results" for the 2019-2020 Performance Year</u>

On June 26, 2020, Fuller issued plaintiff an overall performance rating of "Achieved Results" for the 2019-2020 performance year, covering the period from June 1, 2019 to May 31, 2020. *Id.* ¶¶ 193-94. Among other criticisms, Fuller noted in the performance evaluation that plaintiff needed to improve on meeting deadlines, working with subject matter experts and supervisors earlier in the process, and working effectively and civilly with internal teams and external stakeholders. *Id.* ¶ 200. In support of this assessment, Fuller identified several instances in which plaintiff had failed to meet deadlines during the 2019-2020 performance year, *id.* ¶ 201, which Fuller believed caused the delayed publication of those rules, Fuller Dep. Tr. 82:3-12, Ex. 5 at 19, ECF No. 28-8. Fuller also noted that plaintiff was unprepared for the July 25, 2019 external stakeholder meeting for the Brakes III Rule, was unprepared to speak on other presentations, interacted unprofessionally with Bishop on drafting the Brakes III Rule, did not follow Fuller's instructions, and yelled at Fuller. *Id.* at 75:15-76:13, 77:15-78:3, 87:12-94:4.

On June 25, 2020, Fuller signed plaintiff's 2019-2020 performance appraisal. Pl.'s SUMF ¶ 218. Plaintiff thereafter sought both first-level and second-level reconsideration of the rating. *Id.* ¶¶ 219, 223. At both levels, plaintiff's "Achieved Results" rating was upheld. *Id.* ¶¶ 219, 223.

    g.   <u>Plaintiff's Requests for Transfer Are Denied Due To Lack of Reassignment Opportunities</u>

On September 21, 2020, plaintiff emailed Human Resources Director Mark Atkisson to request a permanent transfer to an economist position within the Department. *Id.* ¶ 224. Atkisson told plaintiff he was unaware of any opportunities for reassignment but advised

plaintiff to monitor USAJobs and apply for open positions, advising plaintiff of at least ten open economist positions at a GS-13 level and higher on USAJobs. *Id.* ¶¶ 226, 227.

On November 18, 2020, plaintiff asked Fuller for a transfer within the Department, *id.* ¶ 228, despite knowing that Fuller did not have the authority to transfer him within the Department, *id.* ¶ 230. Fuller informed plaintiff that he supported plaintiff's decision to seek another position but was unaware of available transfer opportunities, and that USAJobs would be a good resource. *Id.* ¶ 229.

Around November 20, 2020, plaintiff asked Fuller for a transfer to a position within the FRA, with hopes for a transfer to Stephen O'Connor's office, a grant review office. *Id.* ¶ 231-32. Fuller informed plaintiff that no internal transfer opportunities existed. *Id.* ¶ 233. Plaintiff admitted that Fuller "would have made the same statement to [him] if [he] was not participating in protected EEO activity." *Id.* ¶ 234 (quoting Peternel Aff. (Feb. 8, 2021), Def.'s Ex. 1 at 17, ECF No. 28-4).

Around January 2021, plaintiff was detailed to the Disadvantaged Business Enterprise within the Office of the Secretary of Transportation, which plaintiff believes Fuller approved. Pl.'s SUMF ¶¶ 235-36. Then, around early 2022, plaintiff started another detail at the FRA within O'Connor's office, but within a week of starting the detail asked that the detail be annulled. *Id.* ¶ 237. Shortly thereafter, plaintiff returned to the RDI Office where he has remained as a GS-13 economist. *Id.* ¶ 238.

## B.    Procedural History

As detailed above, plaintiff has filed two formal EEO complaints, which together alleged age discrimination, sex discrimination, and retaliation. Plaintiff first raised his age discrimination complaint in a meeting on July 15, 2019, then filed his first informal EEO complaint on August 4, 2019, followed by a formal EEO complaint on November 21, 2019. *Id.*

¶¶ 246-47.  On February 3, 2020, plaintiff filed a second informal EEO complaint, followed by a formal complaint on May 18, 2020.  *Id.* ¶¶ 248-49.  On June 23, 2022, those two EEO complaints were consolidated for administrative review.  *Id.* ¶ 250.  Following discovery, on November 3, 2022, an EEO Commission Administrative Judge granted the Department of Transportation's motion for summary judgment.  *Id.* ¶ 251.

On March 10, 2023, plaintiff initiated the instant suit.  *See* Compl., ECF No. 1.  As amended, plaintiff alleges one count of retaliation in violation of Title VII and the ADEA based on plaintiff being "subjected to increased scrutiny, receiv[ing] negative Performance Appraisals[] [and] lower bonus awards[,] and [being] denied promotional opportunities."  Am. Compl. ¶ 74, ECF No. 9.  Plaintiff does not bring any discrimination claims.

On November 28, 2023, the Court granted in part and denied in part defendant's partial motion to dismiss certain claims, dismissing the ADEA retaliation claims predicated on alleged conduct that predated the July 15, 2019 activity protected under the ADEA; the Title VII retaliation claims predicated on alleged conduct that predated the November 21, 2019 activity protected under Title VII; and the claims related to alleged employment actions that were not materially adverse.  *Peternel*, 2023 WL 8233548 at *11.  At the motion to dismiss stage and without the benefit of discovery, dismissal was denied as to two claims that could constitute materially adverse employment actions: (a) Fuller's alleged retroactive changing of plaintiff's grade for seven Economics Weekly Update reports from "Yes" to "No"; and (b) the denial of plaintiff's request for a job transfer on November 20, 2020.  *Id.*  Six additional claims for which defendant had not sought dismissal also remained pending.  *Id.*

Defendant has now moved for summary judgment on these remaining claims, and this motion is ripe to resolve.  *See* Def.'s Mot. Summ. J. ("Def.'s MSJ"), ECF No. 28; Def.'s Mem.

Supp. MSJ ("Def.'s Mem."), ECF No. 28-1; Pl.'s Mem. in Opp'n to Def.'s MSJ ("Pl.'s Opp'n"),

ECF No. 33; Def.'s Reply Supp. MSJ ("Def.'s Reply"), ECF No. 38.[2]

## II.    LEGAL STANDARD

Summary judgment may be granted only if "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is

material if it 'might affect the outcome of the suit under the governing law,' and a dispute about

a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In applying this rule, "the mere existence of

some alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no genuine issue of material

fact." *Liberty Lobby*, 477 U.S. at 247-48 (emphases omitted).

The moving party bears the initial burden of demonstrating the absence of a genuine

dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once

the moving party has met this burden, the non-moving party must point to "specific facts

showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).

Both the movant and nonmovant must support their respective positions by "citing to particular

parts of materials in the record" or by "showing that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). "Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

---

[2]         Although each exhibit and submission from the parties in support of and in opposition to the motion for
summary judgment has been reviewed, only those exhibits necessary to provide context for resolution of the pending
motion are cited herein.

functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (internal quotation marks omitted).

While the court must provide the nonmovant the benefit of all reasonable inferences from the record, *see Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23-24 (D.C. Cir. 2013), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the nonmoving party, *Liberty Lobby*, 477 U.S. at 252. Conclusory assertions without support from the record cannot create a genuine dispute of material fact. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009). Indeed, a moving party may succeed on a summary judgment motion by pointing to "an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 323.

## III.    DISCUSSION

Plaintiff's only claims remaining are his Title VII and ADEA retaliation claims relating to (1) plaintiff's lowered performance appraisal from the 2019-2020 performance year; (2) his reassignment to Paperwork Reduction Act duties in March 2020; (3) the denial of his request for a lateral transfer on September 23, 2020; (4) any denial of a GS-14 promotion since November 21, 2019; and (5) the denial of his request for a transfer on November 20, 2020, as well as the ADEA retaliation claims based on (6) the provision of a time-off award instead of a cash award on August 17, 2019; (7) any denial of a GS-14 promotion between July 15, 2019, and November 21, 2019, including the events regarding the Brakes III rulemaking; and (8) the alleged retroactive changing of plaintiff's grade for seven Economics Weekly Update reports from "Yes" to "No." *See Peternel*, 2023 WL 8233548 at *11. These surviving retaliation claims are grouped by plaintiff into "three categories": (1) "retaliatory efforts to wrongfully deny and

prevent promotion after July 15, 2019," which "denials were directly influenced by" the "[l]owered performance appraisal for the 2019-2020 performance year," "[r]e-assignment to [Paperwork Reduction Act] duties in March 2020," and "[r]etroactive regrading of seven Economics Weekly Update reports from 'Yes' to 'No'"; (2) the "denial of lateral and internal job transfers"; and (3) the "retaliatory refusal to provide cash award instead of time-off award."  Pl.'s Opp'n at 5-6, 12.  Each of these three categories is discussed, following analysis of a threshold issue and review of the applicable legal framework for evaluating retaliation claims under Title VII and the ADEA.

### A.     Defendant's Motion Complied With Procedural Requirements.

As a threshold matter, plaintiff challenges defendant's motion as suffering from "procedural and general problems"—namely, that defendant has made a response difficult by citing to "a shocking number of facts."  *See* Pl.'s Opp'n at 11.  Far from procedurally deficient, however, defendant's citations to record evidence comport squarely with Federal Rule of Civil Procedure 56(c)(1), which in part requires parties to support factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  The voluminous evidence in this case arises largely from the many claims alleged by plaintiff.  *See Peternel*, 2023 WL 8233548, at *5-6 (raising over a dozen claims in support of one count of retaliation, of which eight claims remain at summary judgment).  By his own account, plaintiff believes he has been unfairly denied a promotion since 2017, which has resulted in over five years of relevant factual history between plaintiff and his employer.  As other employment cases demonstrate, the mere existence of extensive facts, without more, cannot defeat a summary judgment motion.  *See Warren v. Pon*, 304 F. Supp. 3d 165, 168-77 (D.D.C. 2018), *aff'd sub nom. Warren v. Weichert*, 2018 WL 5819390 (D.C. Cir. Nov. 1, 2018)

(granting summary judgment motion); *St. John v. Napolitano*, 20 F. Supp. 3d 74, 77-86 (D.D.C. 2013)*, aff'd sub nom. St. John v. Johnson*, 608 F. App'x 6 (D.C. Cir. 2015) (same).

## B.    Legal Framework For Analysis of Retaliation Claim

"Both Title VII and the ADEA prohibit the federal government from retaliating against employees who complain of employment discrimination." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *see also* 42 U.S.C. § 2000e-3(a) (prohibiting, under Title VII, an employer from "discriminat[ing] against any of [its] employees . . . because he has made a charge . . . or participated in any manner in an investigation" of discrimination); 29 U.S.C. § 623(d) (containing, under the ADEA, a similar prohibition).  Whether brought under Title VII or the ADEA, retaliation claims based only on circumstantial evidence are subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016) (applying test in a Title VII case); *Stoe v. Barr*, 960 F.3d 627, 639 (D.C. Cir. 2020) (applying test in an ADEA case); *see also Tomasello v. Rubin*, 167 F.3d 612, 619 (D.C. Cir. 1999) ("[T]he test for determining retaliation under the ADEA and Title VII is identical.").

Under the *McDonnell Douglas* framework, "a plaintiff must first establish a *prima facie* case of retaliation by showing (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones*, 557 F.3d at 677.  Should a plaintiff meet his *prima facie* burden, the burden shifts to the employer to produce a "legitimate, nondiscriminatory reason" for its actions.  *Id.*  If the employer does so, the burden shifts back to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).  To show pretext, the plaintiff must establish that his "protected activity was a but-for cause of the

alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). Evidence of pretext can include "better treatment of similarly situated employees outside the plaintiff's protected group," "inconsistent or dishonest explanations," "deviation from established procedures or criteria," a "pattern of poor treatment of other employees in the same protected group as the plaintiff, or "other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

Critically, in considering the employer's proffered non-retaliatory reasons, a court considers "not the correctness or desirability of the reasons offered," but "whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotation marks and alteration omitted). "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." *Id.* (quoting *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir. 1994)).

### C. Plaintiff Has Not Established That He Was Denied a Promotion for Retaliatory Reasons.

On the merits, plaintiff maintains that only retaliation can explain his lack of promotion. Defendant, however, has provided legitimate, non-retaliatory reasons for denying plaintiff a promotion, citing plaintiff's repeated failures to complete assignments in a timely manner without substantive and procedural errors. Nothing suggests that Fuller's assessment of plaintiff's work after he engaged in protected activity—much of which is consistent with Fuller's assessment before the protected activity—was pretextual.

As the record evidence reflects, Fuller has consistently viewed plaintiff's work as falling below the standard required for a GS-14 promotion. From the outset of their working relationship and long before plaintiff engaged in a series of activity protected under Title VII and

the ADEA, plaintiff and Fuller have disagreed over plaintiff's promotability.  In plaintiff's own

telling, Fuller first unfairly denied him a promotion in July 2017—two years *before* plaintiff's

first protected activity—and then unfairly denied him a promotion at least two more times after

that, before plaintiff complained of age discrimination on July 15, 2019.  *See* Pl.'s Opp'n at

15-16 (complaining that Fuller promoted Anderson based on work not performed under Fuller's

supervision but did not do the same for plaintiff); *id.* at 17-19 (arguing that his work on the

Locomotive Rule warranted a promotion); *id.* at 19-20 (same, for his work on the State Action

Plan).  None of these promotion denials predating plaintiff's protected activity can support a

retaliation claim.  *See Univ. of Tex. Sw. Med. Ctr.*, 133 S. Ct. at 2534 (explaining that a

successful retaliation claim must establish that the adverse action would not have occurred

"but-for" plaintiff's protected activity); *Hayslett v. Perry*, 332 F. Supp. 2d 93, 98 (D.D.C. 2004)

(rejecting "alleged retaliatory acts [that] predate[d] the relevant protected EEO activity").  To the

contrary, these prior denials suggest a lack of causality between plaintiff's protected activity and

Fuller's later, consistent assessments of plaintiff's performance.  *Cf. Clark Cnty. Sch. Dist. v.

Breeden*, 532 U.S. 268, 272 (2001) (explaining that there "is no evidence whatever of causality"

if the employer continues to "proceed[ ] along lines previously contemplated").

Plaintiff's contention that he satisfactorily took a rulemaking from beginning to end, and

that Fuller's 2019-2020 evaluation of his work "was intentionally lower than it should be"

because he engaged in protected activity, lacks evidentiary support.  Pl.'s Opp'n at 16-22.  In

plaintiff's 2018-2019 performance evaluation, which preceded plaintiff's first protected activity,

Fuller highlighted several areas of improvement, including: "[m]eet[ing] deadlines";

"[d]evelop[ing] a plan and methodology with the assistance of the [subject matter experts] early

in [his] analysis"; and "[m]ak[ing] sure [the] Weekly update is accurate, especially all numbers

and dates." Pl.'s 2018-2019 Performance Evaluation, Def.'s Ex. 15 at 25, ECF No. 28-18. In

the following periods, however, Fuller continued to view plaintiff as struggling with these same

problems, among others. *See* Pl.'s 2019-2020 Performance Evaluation, Def.'s Ex. 15 at 36, ECF

No. 28-18 (indicating that plaintiff needed to improve on "meet[ing] deadlines," "work[ing] with

[subject matter experts] earlier in the process in developing methodology," "improv[ing] [his]

writing," and "work[ing] effectively and civilly" with others); Pl.'s SUMF ¶¶ 160-64 (noting

plaintiff submitted multiple weeks of erroneous weekly updates). Although "[e]vidence

indicating that an employer misjudged an employee's performance" is "relevant" to the question

of pretext, plaintiff has not produced evidence for a reasonable jury to conclude that Fuller's

evaluation of plaintiff's performance was erroneous, much less "an error too obvious to be

unintentional" and explained only by pretext. *Fischbach*, 86 F.3d at 1183.

Notably, plaintiff does not dispute repeatedly failing to meet original deadlines and

requiring multiple extensions for important rulemaking assignments. For instance, after plaintiff

expressed discontent with the lack of promotion-eligible work, Fuller reassigned the Brakes III

Rule from another economist to plaintiff as a path for promotion. Email from Fuller to Peternel

(Jul. 16, 2019), Def.'s Ex. 18 at 8, 15, ECF No. 28-21. Fuller explained that the Brakes III Rule

was "the highest priority of the Administrator" who "will want it completed on an expedited

timeline." *Id.* at 8. Nonetheless, despite being alerted of the project's importance and urgency,

plaintiff informed Fuller two days after the deadline that only 20% of the Brakes III Rule had

been drafted. Pl.'s SUMF ¶ 81 (uncontested). Plaintiff did not report the work as completed

until almost a month later, *id.* ¶ 82 (uncontested). Even then, plaintiff unilaterally continued

changing major sections of the analysis while Fuller was in the document, *id.* ¶ 83 (uncontested),

causing Fuller to stop his review so that plaintiff could finish, *id.* ¶ 84 (uncontested). When

plaintiff later received Fuller's comments, plaintiff again required two more extensions to incorporate the edits, each time asking for the extension on the due date. *Id.* ¶¶ 85-88 (uncontested). Similarly, plaintiff's performance on the Drug and Alcohol Rule was marred by last-minute extensions. *See id.* ¶¶ 57-61 (uncontested) (requesting two extensions, each on the deadline date). Plaintiff complains that the deadlines were "unreasonable," but not only did plaintiff set many of these deadlines himself, *see id.* ¶¶ 57-58, 85, 86 (telling Fuller when he would be done), plaintiff has offered no evidence for the deadlines' unreasonableness other than his own personal opinion, *see Moss v. Hayden*, No. 18-cv-470, 2020 WL 4001467, at *8 (D.D.C. Jul. 15, 2020) (rejecting retaliation claim because plaintiff "provide[d] no evidence . . . that [the] workload was objectively unreasonable" (internal quotation marks omitted)).

Plaintiff also offers no evidence suggesting that Fuller pretextually critiqued him for failing to confer with experts and supervisors earlier in the rulemaking process. Even before plaintiff first engaged in protected activity, Fuller's formal performance evaluation for plaintiff encouraged him to improve on "[d]evelop[ing] a plan and methodology with the assistance of the [subject matter experts] early in [his] analysis." Pl.'s 2018-2019 Performance Evaluation, Def.'s Ex. 15 at 25, ECF No. 28-18. Despite this critique, Fuller found that plaintiff committed the same error on the Drug and Alcohol Rule, waiting until "[a]fter essentially everything was done" before discussing his methodology and leaving insufficient time to confer with the Office of the Secretary of Transportation. Fuller Dep. Tr. 84:12-85:2, Def.'s Ex. 5 at 20-21, ECF No. 28-8. Plaintiff points to no evidence to contradict the accuracy of this fact, much less shown that, even if Fuller were mistaken in his belief regarding plaintiff's failure to seek timely input, that Fuller was "making up or lying about" his belief. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008); *see also id.* at 496 ("The question is not whether the underlying . . . incident

occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying . . . incident occurred." (emphasis in original)); *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) ("[A]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false.").[3]

Similarly, plaintiff has not demonstrated that Fuller pretextually critiqued plaintiff for failing to work effectively and civilly with internal and external parties.[4]  According to Fuller, among other issues, plaintiff had inadequately prepared for a meeting on July 25, 2019 with external stakeholders about the Brakes III Rule.  Fuller Dep. Tr. 87:12-88:22, Def.'s Ex. 5 at 21, ECF No. 28-8.  Plaintiff denies he was not prepared, Pl.'s SUMF ¶ 90, but concedes he failed to review all the necessary documents before the meeting and incorrectly informed the stakeholders that he never received a spreadsheet his colleague had in fact shared a week earlier, *id.* ¶¶ 92-97 (uncontested).  Plaintiff attempts to justify this failure by arguing that Fuller should have given

---

[3]    In plaintiff's response to defendant's statement of material facts, plaintiff claims, without citation to any record evidence, that at some point he "revised" the analysis for the Drug and Alcohol Rule based on input from an individual named Gerald Powers, who plaintiff describes without further elaboration as "the [subject matter expert] who had happened to have written an economic analysis when working for a different agency."  Pl.'s SUMF ¶ 64. The timing of when exactly during plaintiff's year long tenure on the Drug and Alcohol project that plaintiff conferred with Powers to "revise" his economic analysis, or who Powers is in relation to the Office of the Secretary of Transportation, is unclear.  Plaintiff's opposition brief, far from offering clarification, provides *no* argument rebutting defendant's statement that plaintiff failed to confer in a timely manner with relevant parties.  A district court is "fully justified in treating as admitted [one party's] statement of material facts" where the other party has failed to "poin[t] to specific parts of the record controverting" those facts.  *SEC v. Banner Fund Int'l*, 211 F.3d 602, 616 (D.C. Cir. 2000); *see also Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988) (stating that a district court is not "obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material disputed fact").

[4]    Plaintiff's contention that another supervisor during one of his two details rated him favorably cannot defeat summary judgment.  *See* Pl.'s Opp'n at 14-15 (arguing that, for one of his two details to another office, he earned an "Outstanding" rating and an award for his performance).  "It is settled that it is the perception of the decision maker which is relevant" in the pretext inquiry, *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (internal quotation marks omitted), and plaintiff does not dispute that Fuller was the relevant recommender for plaintiff's promotion, *see, e.g.*, Pl.'s Opp'n 1.  Plaintiff's good performance in another position, under another supervisor, does not necessarily prove that Fuller's more critical assessment of plaintiff's performance was pretextual.  *Cf. Crowley v. Perdue*, 318 F. Supp. 3d 277, 291 (D.D.C. 2018) ("[W]hile an employee may have done his job well in the past, there is nothing that necessarily prevents his performance from deteriorating later or new management stepping in and starting to notice existing issues[.]").

him more time to prepare for the meeting and told him which documents were important to review. *Id.* ¶ 98. A district judge, however, does not sit as a "super-personnel department that reexamines an entity's business decisions." *See Fischbach*, 86 F.3d at 1183 (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). In the context of a retaliation claim, an employer prevails so long as it "honestly believes in the reasons it offers." *Id.* (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992)). Here, plaintiff does not dispute that Fuller believed plaintiff was either not fully prepared for the meeting or had provided the external stakeholder false information. Pl.'s SUMF ¶ 98 (uncontested).

Plaintiff's contention that his assignment to Paperwork Reduction Act duties constituted retaliation similarly falls short. *See* Pl.'s Opp'n at 22-23. In plaintiff's view, being assigned to dedicate 20% of his time to Paperwork Reduction Act duties, for which plaintiff did not receive promotion credit, entailed less time spent on promotion-eligible assignments. *Id.* While this may be true, there is simply no probative evidence to support plaintiff's supposition that he would not have been assigned to Paperwork Reduction Act duties "but-for" his protected activity. *See Univ. of Tex. Sw. Med. Ctr.*, 133 S. Ct. at 2534. As plaintiff's position description states, a GS-13 economist may be required to perform "other duties as assigned." Pl.'s SUMF ¶ 190 (quoting Industry Economist, GS-0110-13 Position Description (Nov. 20, 2009), Def.'s Ex. 14 at 4, ECF No. 28-17). In September 2019, shortly after plaintiff first engaged in protected activity, Fuller assigned all the Paperwork Reduction Act duties to one of plaintiff's co-workers, Wells, who had volunteered for the task. Pl.'s SUMF ¶ 181. When Wells became overwhelmed, Fuller asked Purnell, another one of plaintiff's co-workers, to assist in the duties. *Id.* ¶ 186. Only when Fuller realized still more assistance was needed did he also staff plaintiff, *id.* ¶ 187,

resulting in Purnell and Fuller each working on Paperwork Reduction Act duties one day a week, *id.* ¶ 188. These facts do not suggest that Fuller assigned plaintiff these duties as retaliation. *See Walker v. D.C.*, 279 F. Supp. 3d 246, 267 (D.D.C. 2017) (finding that "heavier work responsibilities" did not "imply an adverse action" in plaintiff's case, because plaintiff "admit[ted] that she was told that they needed additional support" at work and "needed someone to cover" (internal quotation marks omitted)). Indeed, when Wells needed assistance, Fuller had first assigned the task to Purnell, who had not engaged in protected activity and who also did not receive promotion credit for his Paperwork Reduction Act work. *See* Pl.'s SUMF ¶ 24 (conceding that Fuller promoted Purnell for his work on the Brakes II proposed rulemaking).

Plaintiff also cannot show that retaliatory reasons motivated Fuller's retroactive correction of plaintiff's grade from "Yes" to "No" for five erroneous Economics Weekly Update reports. *See* Pl.'s Opp'n at 23-26.[5] Plaintiff contends that Fuller's practice of giving retroactive "No" grades was "a novel tool designed . . . to retaliate against [p]laintiff for his submission [of an informal EEO complaint] only two weeks prior" on August 4, 2019. *Id.* at 26. As the record evidence shows, however, Fuller did not "deviat[e] from established procedures or criteria" when he awarded plaintiff no credit for submitting incorrect weekly updates. *Walker*, 798 F.3d at 1092. McClure attests that when she was hired back in June 2019, a month before plaintiff first engaged in protected activity, she was told that "Economists would not receive credit for the Economics Weekly Update for a particular week if it included one numeric error." McClure Aff., Def.'s Ex. 12 at 3, ECF No. 28-15. In July 2019, when plaintiff nevertheless expressed

---

[5] Plaintiff's complaint alleges that Fuller instructed plaintiff's grade to be retroactively changed from a "Yes" to a "No" for seven weeks, *see* Am. Compl. ¶ 33, but defendant's motion for summary judgment asserts it was five weeks, *see* Def.'s Mem. at 23, and plaintiff's filings inconsistently allege both five and seven weeks, *compare* Pl.'s Opp'n at 3 (five weeks) *and* Pl.'s SUMF ¶ 165 (five weeks) *with* Pl.'s Opp'n at 6, 23 (seven weeks). A copy of the spreadsheet tracking the weekly grades provided by plaintiff as an exhibit indicates that plaintiff's grades were changed for five weeks. *See* Pl.'s Ex. 23 at 2, ECF No. 37-1 (grades changed for weeks between July 14, 2019, and August 17, 2019); *see also* Pl.'s SUMF ¶ 165 (similar).

confusion at the expectation that the updates be completed "perfectly," Pl.'s SUMF ¶ 146, Fuller

reiterated the no-error standard to plaintiff and explained that by reviewing the updates weekly,

any error in one week "should be found and fixed by the following week," Email from Fuller to

Peternel (Jul. 16, 2019), Def.'s Ex. 18 at 8, ECF No. 28-21.  Fuller told plaintiff, "I will hold

you, as I do the entire division, to this standard in the 2019-2020 year."  *Id.*  True to his word,

Fuller also gave two other economists—neither of whom engaged in protected activity—"No"

grades for incorrect numbers as he did with plaintiff.  *See* Pl.'s Opp'n at 25 (conceding that

Purnell and Ullah Kifayat also received zero credit for erroneous updates).

Plaintiff's various attempts to portray his "No" grades as more punitive than the grades

his colleagues received lacks sufficient evidentiary support.  According to plaintiff, the

"retroactive" grading reveals "a broader effort to build a negative performance record following

[his] EEO activity."  Pl.'s Opp'n at 3 (emphasis omitted).  This view is undercut by plaintiff's

admission that Kifayat, another economist who did not engage in protected activity, also

received retroactive "No" grades from Fuller.  *Id.*  Plaintiff next contends that McClure never

received retroactive "No" grades for her errors, *id.* at 26, but this contention is not supported in

the record either. Instead, McClure attested that she "d[id] not track the status of [her] updates"

and "cannot say for certain" what grades she received.  McClure Aff., Def. Ex. 12 at 4, ECF No.

28-15.  Plaintiff also attempts to downplay his transposition error, explaining that "[t]he numbers

were otherwise accurate, just mispositioned," and were in the correct order in another file.  Pl.'s

Opp'n at 24.  These protestations, however, do not negate the uncontested fact that

"mispositioned" numbers are inaccurate numbers.  *See* Pl.'s SUMF ¶ 160.  Finally, plaintiff

challenges the fairness of Fuller's grading system, arguing that he suffers a higher likelihood of

error because he reports more numbers, yet receives no "additional credit."  Pl.'s Opp'n at 25.

While plaintiff may find this grading system frustrating, "[i]t is not this Court's job to decide if defendant's [decisions] were wise, fair, or correct." *Kelly v. Mills*, 677 F. Supp. 2d 206, 229 (D.D.C. 2010) (internal quotation marks omitted), *aff'd*, 2010 WL 5110238 (D.C. Cir. Dec. 14, 2010).  The only inquiry is whether an employer "honestly believed" in his decision, *id.*, and here, no reasonable jury could find from the evidence that Fuller pretextually gave plaintiff "No" grades for updates later discovered to be erroneous.

Lastly, none of plaintiff's proffered comparators are similarly situated. *See* Pl.'s Opp'n at 15-16 (naming Anderson, Wells, Arbuckle, and Purnell as comparators).  To raise an inference of retaliation based on comparator evidence, a plaintiff must establish that "all of the relevant aspects of [his] employment situation" are "nearly identical to those of [another] employee." *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (internal quotation marks omitted).  Here, plaintiff's primary contention is that Fuller's promotion requirements differed among the economists he supervised: Fuller promoted Anderson for work performed before Fuller joined the RDI Office; Wells for her full-time work on Paperwork Reduction Act duties; and Arbuckle and Purnell for completing only "a single rule" each. *Id.*

Plaintiff's logic suffers at least two fatal flaws, however.  First, Fuller promoted Anderson for earlier work and declined to do the same for plaintiff *before* plaintiff engaged in any protected activity, and thus Anderson's promotion cannot support a retaliation claim. *See* Pl.'s SUMF ¶ 122 (admitting Anderson was promoted in 2017).  Second, plaintiff has not shown that Fuller viewed the economists he promoted as similarly struggling to meet deadlines, arriving unprepared to a stakeholders meeting, and failing to confer in a timely matter with subject matter experts and supervisors during the rulemaking process, among other issues. *See* Pl.'s Opp'n at 16 (asserting, as the only similarities, that his proffered comparators were all "economists"

previously at the GS-13 level and "all reported to Mr. Fuller").[6]  "In the absence of evidence that

the comparators were actually similarly situated [to plaintiff], an inference of falsity or

[retaliation] is not reasonable."  *Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008)

(internal quotation marks omitted).[7]

### D.    Defendant Did Not Transfer Plaintiff Because No Transfer Opportunities Were Available at the Time.

Plaintiff next contends that he was unlawfully denied a transfer, first to a position within

the broader Department of Transportation in September 2020 and then to a position within the

FRA in November 2020.  *See* Pl.'s Opp'n at 6.  Plaintiff believes he is being "trap[ped]" in his

current position as retaliation.  *Id.* at 27.  This claim fails for the simple reason that plaintiff has

not identified any transfer opportunities available at the time.  *See* Def.'s Mem. at 28-29.

Plaintiff has no basis in fact for his assertion that defendant "could have laterally

transferred [p]laintiff," but "simply cho[se] not to do so."  Pl.'s Opp'n at 27.  Under guidance

---

[6]    An additional flaw is that the decision to promote Anderson was made prior to Fuller becoming Staff Director in July 2017, and thus Fuller was merely involved in signing the paperwork for the promotion, rather than as a decisionmaker.  *See* Fuller Dep. Tr. 63:11-64:15, Ex. 5 at 16, ECF No. 28-8.  While plaintiff disputes this, plaintiff's evidence to the contrary rests on inadmissible hearsay.  *See* Peternal Aff. ¶ 37, Pl.'s Ex. 19, ECF No. 33-23 (declaring, "Mr. Anderson told Plaintiff that he told Mr. Fuller that he was eligible for non-competitive promotion and that Mr. Fuller was the decision maker.").  Inadmissible hearsay cannot be considered at summary judgment.  *See Greer v. Paulsen*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (internal quotation marks omitted) ("To survive summary judgment the non-moving party must produce evidence . . . capable of being converted into admissible evidence."); *Hernandez v. Pritzker*, 741 F.3d 129, 134 (D.C. Cir. 2013) (concluding that plaintiff's "own statement" about what "two colleagues told her" is "pure hearsay" and "counts for nothing in an opposition to summary judgment" (internal quotation marks omitted)); *Markowicz v. Johnson*, 206 F. Supp. 3d 158, 175 n.9 (D.D.C. 2016) ("Hearsay evidence that cannot be converted to admissible evidence is not considered on summary judgment.").

To the extent plaintiff also views Bishop as a comparator, *see* Pl.'s Opp'n at 3 (listing Bishop as a comparator in the factual background section of the brief), *but see id.* at 15-16 (dropping Bishop as a comparator in the analysis section), that comparison would also fall short.  Plaintiff offers no evidence suggesting Fuller was the decisionmaker behind Bishop's promotion, and Fuller testified he had only ever decided to promote four economists: Anderson, Wells, Arbuckle, and Purnell.  *See* Fuller Dep. Tr. 62:8-14, Def.'s Ex. 5 at 16, ECF No. 28-8.

[7]    Plaintiff also complains that Fuller narrowed the scope of a special project assigned to him to create an automated Excel spreadsheet for certain regulatory analyses.  This assertion is immaterial, as plaintiff never claims Fuller assigned the special project as an alternative path to promotion.  *See* Pl.'s Opp'n at 22; *see also* Pl.'s SUMF ¶ 23 (stating, as uncontested fact, that Fuller told plaintiff he must demonstrate he could take a rulemaking from beginning to end to be promoted).

from the Office of Personnel Management ("OPM"), federal employees wishing "[t]o apply for a transfer . . . must first conduct [their] own job search" and "apply to agencies in response to vacancies announced." Details & Transfers, Office of Personnel Management, https://perma.cc/U83G-8DKU. Plaintiff admits he had no specific position in mind when he first requested a transfer within the Department in September 2020 with Human Resources Director Mark Atkisson. *See* Pl.'s SUMF ¶ 225. Atkisson informed plaintiff that he was unaware of reassignment opportunities within the Department, but identified for plaintiff at least ten open economist positions at the GS-13 and higher level on USAJobs and encouraged plaintiff to apply. *See id.* ¶¶ 226-27. Nothing in the record suggests, however, that plaintiff pursued any of the ten positions identified by Atkisson.

When plaintiff approached Fuller to request a transfer within the FRA in November 2020, Fuller similarly expressed unawareness of any open transfer opportunities. *See id.* ¶¶ 231, 233. Plaintiff does not dispute this fact, indeed admitting that Fuller "would have made the same statement to [plaintiff] if [he] was not participating in protected EEO activity." *Id.* ¶ 234 (quoting Peternel Aff., Ex. 1 at 17, ECF No. 28-4). Plaintiff also concedes that Fuller had encouraged plaintiff to apply to other positions. *See id.* ¶ 229. Again, nothing suggests that plaintiff applied for any other positions following his discussion with Fuller.

Plaintiff cannot point to McClure or Wells as adequate comparators. As to the latter co-worker, plaintiff cites no evidence indicating that Wells had been transferred. *See* Pl.'s Opp'n at 27. As to McClure, plaintiff provides no context for McClure's transfer except that she was a GS-13 employee who transferred laterally *into* the RDI Office two years before plaintiff's request to transfer out of the RDI Office. *See* Pl.'s SUMF ¶ 242 (discussing McClure's transfer in 2018). Plaintiff has not suggested, for instance, that McClure received the transfer position

without applying for it, or that McClure also received opportunities to transfer outside of the RDI Office as plaintiff wishes to do. No reasonable jury thus could conclude that plaintiff's request for a transfer is "nearly identical" to McClure's. *See Holbrook*, 196 F.3d at 261.

Finally, plaintiff's argument that he was detailed to other offices in 2021 and 2022 cuts against rather than in favor of his retaliation claim. In plaintiff's view, his two temporary details prove that Fuller lied about the lack of transfer opportunities the year or so before. *See* Pl.'s Opp'n at 4. This reasoning does not follow, for two reasons. First, plaintiff conflates being detailed, a "temporary assignment" that ends in the employee's return to his original duties, and being transferred, a permanent change in position. *See* Chapter 35, Glossary of Terms Used in Processing Personnel Actions, OPM, https://perma.cc/YL76-Z7SX. Second, Fuller *approved* plaintiff's detail, a fact plaintiff does not dispute, *see* Pl.'s SUMF ¶ 236, undercutting plaintiff's contention that Fuller wishes to "trap" plaintiff in his current position, *see* Pl.'s Opp'n at 27.

### E. Defendant Awarded Plaintiff an Eight-Hour Time-Off Award Instead of a Cash Award Because of His Performance.

Finally, though "[a]dmitting[] this is a smaller matter," plaintiff maintains that receiving only a time-off award of eight hours, when most others received some mix of time-off and cash of $500 to $1,000, evinced retaliatory animus. *See* Pl.'s Opp'n at 27; *see also* Bonus Spreadsheet, Pl.'s Ex. 4 at 10, ECF No. 33-6. This claim lacks evidentiary support. Defendant has presented a legitimate, non-retaliatory reason for denying plaintiff a cash bonus: Plaintiff "was continually missing deadlines and struggled with the work that had been assigned to him." Fuller Aff. (Jun. 12, 2020), Ex. 4 at 10, ECF No. 28-7. Plaintiff protests that "every other single employee received a cash award, and, some received both hours and cash," Pl.'s Opp'n at 28, but plaintiff cites no evidence establishing the other individuals as comparators. For all the reasons discussed above, *see supra* III.C, plaintiff has neither demonstrated that he was similarly situated

32

to his co-workers nor proffered evidence suggesting that Fuller's assessment of his performance was pretextual.

## IV.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment, ECF No. 27, is GRANTED.  An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  October 28, 2025

_____
**BERYL A. HOWELL**
United States District Judge